782 F.2d 1307
 UNITED STATES of America, Plaintiff-Appellee-Cross-Appellant,
v.
Glynn BATSON and Southplains Land Corporation,
Defendants-Appellants-Cross-Appellees,
and
Johnny Lemmons, Defendant-Cross-Appellee (and related Cases
No. 84-1711-1716).
 No. 84-1710.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 18, 1986.
 
 John Saleh, Lamesa, Tex., Johnny Roy Phillips, Seminole, Tex., for Batson & South Plains.
 McWorter, Cobb & Johnson, Lubbock, Tex., for Lemmons.
 John L. Shepherd, Johnny Roy Phillips, Seminole, Tex., for defendants-appellants cross-appellees in Nos. 84-1711, 84-1713 and 84-1716.
 Wm. French Smith, Atty. Gen., Civ. Div., Dept. of Justice, Washington, D.C., James A. Rolfe, U.S. Atty., Fort Worth, Tex., Roger L. McRoberts, Asst. U.S. Atty., Lubbock, Tex., Robert L. Ashbaugh, Judith Rabinowitz, Attys., Civ. Div., Dept. of Justice, Washington, D.C., for the U.S.
 John L. Shepherd, Johnny Roy Phillips, Seminole, Tex., for Leverett, Don Wilson, et al.
 Dempsey Prappas, Houston, Tex., pro se.
 G. Ernest Caldwell, Houston, Tex., pro se.
 John L. Shepherd, Johnny R. Phillips, Seminole, Tex., for James H. Wilson.
 Kenneth Jones, Lubbock, Tex., for Estate of Robt. Crowder.
 Appeal from the United States District Court for the Northern District of Texas.
 Before GOLDBERG, JOLLY and HIGGINBOTHAM, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 Some farmers from Gaines had a plan.
 
 
 2
 It amounted to quite a big scam.
 
 But the payments for cotton
 
 3
 began to smell rotten.
 
 
 4
 Twas a mugging of poor Uncle Sam.
 
 The ASCS and its crew
 
 5
 uncovered this fraudulent stew.
 
 
 6
 After quite a few hearings,
 
 
 7
 the end is now nearing--
 
 
 8
 It awaits our judicial review.
 
 
 9
 The United States initiated these seven suits in 1979 to enforce administrative determinations of the Agricultural Stabilization and Conservation Service (ASCS), which ordered appellants to refund overpayments of cotton subsidies obtained in 1972 and 1973 through a scheme or device to defeat the purpose of the Upland Cotton Price Support Program, 7 U.S.C. Sec. 1444(e), or to evade the program payment limitation. The scheme first came to the attention of the ASCS when audit reports revealed that program payments to recipients in Gaines County, Texas, were five times that of comparable cotton producing regions.
 
 
 10
 The scam involved millions of dollars, and the facts underlying the cases are set out in detail in U.S. v. Batson, 706 F.2d 657, 659-71 (5th Cir.1983). Suffice it to say here that by combining the operation of two farms whose yield and payment rates under the program differed significantly, the appellants created a synergistic union in which the combined or "reconstituted" farm received payments several times greater than the sum of the payments that each farm would have received separately. Several appellants were not involved in the actual selection and reconstitution of the farm lands, but they nonetheless managed to undermine the program by other means. "In several cases, they (1) leased parts of such farms because of the high program payments these tracts would command; (2) were only 'straw' tenants, not actually farming the land but enabling the farm operator to evade the $55,000 program limitation; or (3) were not actually separate 'persons' entitled to payments within the regulations." Id. at 666.
 
 
 11
 After hearings at the county, state, and national level, the ASCS determined that appellants had knowingly engaged in a scheme or device to defeat the purpose of the Upland Cotton Program or to evade the program limitation. When appellants refused to refund the amounts for which they had been held liable, the United States filed twelve suits in 1979 to enforce the administrative determinations. The government pursued one case in advance of the others to test its theory that the determinations were final and nonreviewable under 7 U.S.C. Sec. 1385. In that case, the district court awarded the United States summary judgment, and this court affirmed. United States v. Jones, Civil Action No. CA 5-79-56 (N.D.Tex., Memorandum May 12, 1980; Final Judgment Oct. 22, 1980), aff'd mem., 659 F.2d 1073 (5th Cir.1981).
 
 
 12
 When the government sought summary judgment in the remaining eleven cases, including the seven here, some new issues had been raised and the district court dismissed the government's complaints on the alternative grounds that the statute of limitations had run or that the applicable regulation was unconstitutionally vague and overbroad.[1] The government appealed, and this court reversed the district court on both grounds and remanded the cases. United States v. Batson, 706 F.2d 657 (5th Cir.1983). This prior appeal left open the issues that are before us now.
 
 
 13
 On remand, the United States renewed its motion for summary judgment, again asserting the finality of the ASCS determinations under 7 U.S.C. Sec. 1385. The appellants responded that the administrative proceedings were riddled with violations of due process. Alleged violations included inordinate delay in the administrative process, bias and prejudgment on the part of hearing officers, and the lack of an opportunity to call, confront, and cross-examine witnesses. Some appellants also claimed that, as "operators," they could not be held liable under a regulation that only required refunds from "producers." Others claimed that they never actually received any payments. The district court, 588 F.Supp. 871, rejected each of defendants' claims, entered summary judgment in favor of the United States, and assessed an award in the amount of the subsidy overpayments as determined by the agency, plus interest from the dates of the final agency determinations. On the basis of 7 C.F.R. Sec. 722.812(k) (1974), the United States moved to amend the judgments to provide interest from the dates the payments were issued. That motion was denied without explanation.
 
 
 14
 Both parties appealed. The defendants appeal the district court's grant of summary judgment, and the government seeks an award of interest in accord with its reading of the regulation. We affirm the judgment of the district court, but we reverse as to its award of interest.
 
 I. SCOPE OF REVIEW
 
 15
 Our review of the ASCS's determination is restricted by 7 U.S.C. Sec. 1385, which provides in relevant part:
 
 
 16
 The facts constituting the basis for any ... payments under the cotton set-aside program ... when officially determined in conformity with the applicable regulations ... shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government.
 
 
 17
 As appellants do not contend that the ASCS violated its own regulations, this provision precludes this court from reviewing the ASCS's findings of fact. United States v. Jones, supra; see also United States v. Blackwell, 467 F.2d 1377 (5th Cir.1972) (holding that 7 U.S.C. Sec. 1785, which contains identical language, precludes review of agency findings of fact).
 
 
 18
 Several of the appellants argue that they cannot be held liable for refunds under 7 C.F.R. Sec. 722.817 because they are not "producers" and did not "receive" program payments. 7 C.F.R. Sec. 722.817, as amended, provides:
 
 
 19
 A producer who is determined by the State committee, or the county committee with the approval of the State committee, to having knowingly ... adopted any scheme or device which tends to defeat the purpose of the program, ... shall not be entitled to payments for any farm under the program and shall refund to the Commodity Credit Corporation all payments received by him with respect to the program.
 
 
 20
 (emphasis added).
 
 
 21
 As the district court noted on remand, however, the government
 
 
 22
 does not dispute the fact that some of the defendants were not "producers." The point is that the entire scheme to evade the regulations, and particularly the $55,000.00 per producer payment limitation, was the joint effort of producers and operators. The defendants who are claiming innocence in the fact that they were operators and not producers were operators for the sole purpose of evading the regulations; the defendant operators retained tracts equaling the $55,000.00 limit, then leased the rest to other defendant "producers" and indirectly received the subsidy payments in the guise of rent. The agency found that the collaborators--both the operators/lessors and producers/lessees--acted knowingly to evade the regulations.
 
 
 23
 Order at 6.
 
 
 24
 On prior appeal, this court noted that this ASCS determination--that several defendants received program funds indirectly in the guise of rent--
 
 
 25
 may not necessarily be entitled to the 'conclusive' effect ASCS factual findings otherwise receive by virtue of 7 U.S.C. Sec. 1385.... Whether they did or did not in fact receive such payments may require a de novo judicial determination. This judicial inquiry is required to determine whether these appellees were properly subject to the authority of the ASCS compliance review process and thus to the application of section 1385.
 
 
 26
 U.S. v. Batson, 706 F.2d at 684 (citation omitted). We hold today that these factual determinations are also entitled to conclusive effect.
 
 
 27
 The question is whether the schemes through which both operators and producers attempted to avoid the program limitations by leasing tracts of land are "facts constituting the basis for ... payments under the cotton set-aside program." 7 U.S.C. Sec. 1385. We believe these schemes clearly are such facts. Absent the schemes, the payments to the lessees would not have been made, and the lessors would not have received their "rent."
 
 
 28
 The anomaly in holding otherwise is readily apparent. We have already held that the schemes of these operators fall within the proscription of the regulations. U.S. v. Batson, 706 F.2d at 682. Cf. Baldridge v. Hadley, 491 F.2d 859, 864-65 (10th Cir.), cert. denied, 417 U.S. 910, 94 S.Ct. 2608, 41 L.Ed.2d 214 (1974). We have no reason to believe that ASCS officials are any less competent to determine facts in this area than they are when program participants receive payments directly. Nor can we discern any reason why defendants who concoct particularly ingenious methods of receiving program payments should receive a trial de novo, while their less stealthy counterparts must content themselves with administrative process alone. If the preclusive effect of 7 U.S.C. Sec. 1385 reaches one set of prohibited schemes, there is no basis in either logic, policy, or the statute to prevent it from reaching another, equally prohibited set of schemes. The lessors here were "properly subject to the authority of the ASCS compliance review process and thus to the application of section 1385." U.S. v. Batson, 706 F.2d at 684.
 
 
 29
 Section 1385 does not, however, accord finality to the administrative determination as a whole. Rather, finality attaches in these cases only to those findings of facts that constitute the basis for program payments. A reviewing court thus finds itself in a position analogous to that of a court confronting a properly presented motion for summary judgment where the facts--determined by administrators in this case--are not in dispute. Only the legal questions remain for review. Of course, the statute does not preclude review of those facts that do not constitute the basis for program payments, such as those underlying alleged constitutional violations. It is to this review that we now turn.
 
 II. DUE PROCESS CLAIMS
 
 30
 Appellants claim that the administrative findings must be set aside because the administrative process was flawed by three distinct violations of their right to procedural due process: first, that the delay in the administrative proceedings gave rise to a due process violation; second, that administrative officials who heard the cases were biased and had prejudged appellants' liability; and third, that appellants were denied the right to call, confront, and cross-examine witnesses. On the record before us, each of these claims is without merit.
 
 A. Delay in the Administrative Proceedings
 
 31
 In some circumstances, delay in the administrative process can rise to the level of a denial of due process. Fusari v. Steinberg, 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975) ("rapidity of administrative review is a significant factor in assessing the sufficiency of the entire process"); Mathews v. Eldridge, 424 U.S. 319, 341-42, 96 S.Ct. 893, 906, 47 L.Ed.2d 18 (1976). In Kelly v. Railroad Retirement Board, 625 F.2d 486, 490 (3rd Cir.1980), for example, a delay of nearly four years in processing a single application for disability benefits was found to be "wholly inexcusable" and a denial of due process.
 
 
 32
 In the cases now before us, a period of over four years elapsed between the initial determinations at the county level and the final decision at the national level. As the district court noted, however,
 
 
 33
 The defendants have not specified what part of the proceedings were delayed but merely assert that some delay, which was allegedly the fault of the United States, violated due process. The only delay reflected in the record was for a criminal investigation (of the same matter). Such a delay was to protect the Fifth Amendment rights of the defendants, not to violate their due process rights. See Polcover v. Secretary of Treasury, 477 F.2d 1223, 1232 (D.C.Cir.1973).
 
 
 34
 The hearings and determinations at the county and state level were completed in a year and a half. At that point, the ASCS suspended the proceedings at the national level to allow the United States Attorney time to investigate whether the appellants' activities provided a basis for criminal prosecution. As soon as the U.S. Attorney notified the ASCS that he had completed his investigation, the ASCS proceeded with its review.
 
 
 35
 The cases cited by appellant for the proposition that delay in the administrative proceedings denied them due process are wholly inapposite. In Kelly, supra, delay in the administrative process deprived the recipient of benefits to which she was otherwise entitled and on which her very health depended. In cases of that type, the private interest in a prompt and speedy determination of benefits weighs heavily in any analysis of what process is due. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The "possible length of wrongful deprivation of ... benefits is an important factor in assessing the impact of official action on the private interests." Fusari v. Steinberg, 419 U.S. at 389, 95 S.Ct. at 540.
 
 
 36
 Other than the interest that every defendant has in being relieved of the uncertainty brought on by pending proceedings, appellants lack any significant interest in having the ASCS resolve its complaint promptly while they continue to retain possession of the subsidies. Moreover, due process cannot be said to compel haste in a civil matter where that haste could significantly prejudice the private party's position in a concurrent criminal investigation. In Polcover v. Secretary of Treasury, 77 F.2d 1223, 1232 (D.C.Cir.1973), the court recognized that to compel a defendant to participate in an administrative hearing while criminal charges were pending could force the defendant to disclose evidence necessary to his defense in a criminal trial. See also Silver v. McCamey, 221 F.2d 873 (D.C.Cir.1955); Cohen v. United States, 369 F.2d 976, 177 Ct.Cl. 599 (1967). The defendant is then faced with the unenviable choice of proceeding to a final administrative determination at the risk of prejudicing his criminal defense, or forfeiting a possibly meritorious administrative claim to preserve his criminal defense. Absent a showing of demonstrable prejudice from an arbitrary and capricious delay, and absent a request from appellants that the administrative hearings proceed notwithstanding the criminal investigations, appellants have not even begun to make out a violation of due process. Polcover, supra; Cohen v. U.S., 369 F.2d at 988. The ASCS acted properly here in suspending the administrative proceedings pending the resolution of the criminal investigation.
 
 B. Bias and Prejudgment
 
 37
 Appellants allege that they were denied due process because both Clifton Adams, the hearing officer at the county level, and Victor Senechal, the hearing officer at the national level, were biased and had prejudged the cases against them. Appellants base their claim against Senechal on a statement, given in a deposition several years after the fact, that "those people in Gaines County had bilked the government out of six million dollars." Senechal Dep. at 85. They fault Adams for his involvement in the prior administrative investigation and for his decision prior to the county hearing to cancel the reconstitutions and allotment transfers that formed the heart of appellants' scheme to abuse the program.
 
 
 38
 It goes without saying that a "fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). This stricture applies equally
 
 
 39
 to administrative agencies which adjudicate as well as to courts. Not only is a biased decisionmaker constitutionally unacceptable but "our system of law has always endeavored to prevent even the probability of unfairness."
 
 
 40
 Withrow v. Larkin, 421 U.S. 35, 46-47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (citations omitted). The Supreme Court noted in Withrow that
 
 
 41
 various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him.
 
 
 42
 Id. at 47, 95 S.Ct. 1464 (footnotes omitted).
 
 
 43
 At the outset, we note that appellants have alleged neither of these two indicators of bias, nor have appellants alleged that these administrators had prejudged individual cases or were biased against particular individuals. At best, appellants have alleged that the roles of investigator and adjudicator were combined in Clifton Adams and that this combination gives rise to an inference of bias.
 
 
 44
 The Supreme Court considered this contention in Withrow:
 
 
 45
 The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.
 
 
 46
 Id. at 47, 95 S.Ct. at 1464. The Court then squarely rejected the argument:
 
 
 47
 It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law.
 
 
 48
 Id. at 56, 95 S.Ct. at 1469.
 
 
 49
 Senechal's deposition statement that "those people in Gaines County had bilked the government out of six million dollars," could be read, depending on the context, as strong evidence of prejudgment. However, Senechal denied in the same deposition ever having prejudged any of the cases.[2]
 
 
 50
 In this context, Senechal's statement is, to borrow the government's analogy, "no different or more egregious than a trial judge telling a jury that a murder has occurred. The bullet-riddled body is proof of the murder; what the judge cannot say is that the defendant shot the gun." Appellee's Brief at 32.
 
 
 51
 Even were we to assume that the hearing officers had decided beforehand that the facts constituted a prohibited scheme or device, no violation of due process would be present. In FTC v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), the Court rejected a claim that members of the FTC disqualify themselves because they had, prior to a hearing on the legality of a pricing scheme, already formed an opinion that the defendants' pricing system was illegal.
 
 
 52
 [T]he fact that the Commission had entertained such views as the result of its prior ex parte investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' basing point practices. Here, in contrast to the Commission's investigations, members of the cement industry were legally authorized participants in the hearings. They produced evidence--volumes of it. They were free to point out to the Commission by testimony, by cross-examination of witnesses, and by arguments, conditions of the trade practices under attack which they thought kept these practices within the range of legally permissible business activities.
 
 
 53
 Id. at 701, 68 S.Ct. at 803 (quoted in Withrow v. Larkin, 421 U.S. at 48, 95 S.Ct. at 1465). Appellants here had similar opportunities in three distinct, de novo hearings.
 
 
 54
 Quite simply, there is no significant evidence to indicate that any hearing officer's mind was irrevocably closed, nor is there any evidence from which we could reasonably infer that either Adams or Senechal was biased. Finally, perhaps the most telling evidence of their lack of bias and prejudgment is the fact that of the 195 farmers against whom Mr. Adams issued initial decisions, 85 were later relieved of liability upon Mr. Adams' recommendation and 8 were exonerated in whole or in part on administrative appeal.
 
 
 55
 C. Lack of Pre-determination Hearing or Opportunity to Subpoena and Cross-examine Witnesses
 
 
 56
 Under this general heading, appellants first challenge the lack of notice and hearing prior to Adams' initial determinations of liability. The agency conducted an investigation, made a determination, and then notified appellants in accordance with the regulations. At that point, the appeal regulations provided the defendants with opportunity for reconsideration and appeal at the county, state, and national levels. 7 C.F.R. Secs. 780 et seq. Appellants' claim is make-weight. Due process requires only "that there is at some stage an opportunity for a hearing." Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599, 70 S.Ct. 870, 873, 94 L.Ed. 1088 (1950). The Supreme Court has "repeatedly held that no hearing at the preliminary stage is required by due process so long as the requisite hearing is held before the final administrative order becomes effective." Id. at 598, 70 S.Ct. at 872. Cf. Hilburn v. Butz, 463 F.2d 1207, 1209 (5th Cir.1972) (due process does not require the ASCS to give notice and hearing before withholding legitimately earned subsidies pending resolution of a disputed overpayment in a previous year).[3]
 
 
 57
 The appellants also contend that they were denied the right to confront and cross-examine government witnesses. As the district court held, however, appellants are grabbing at imaginary straws:
 
 
 58
 The defendants' general assertion implies that hearings were held at which the government called witnesses, but did not allow them to be questioned by the defendants--an obvious denial of due process. The defendants further imply that the record contains instances in which a request for the testimony of a witness was made by a defendant and specifically denied by the government. Both implications are completely inaccurate. On the contrary, the agency made it clear from the outset that, though the defendants had the right to a hearing and to submit evidence and witnesses, it was the responsibility of the defendant to obtain the presence of such witnesses. The government stated on numerous occasions that the agency had no subpoena power and could not compel the testimony of witnesses, and that any testimony, including that of government employees, would have to be obtained voluntarily.... There is no evidence in the record of any attempt by the defendants to obtain the voluntary testimony of any witnesses.
 
 
 59
 Order at 8. These identical points were raised by appellants and rejected in U.S. v. Jones, supra, aff'd mem., 659 F.2d 1073 (5th Cir.1981). On this record, we can discern no violation of due process.[4]
 
 III. INTEREST
 
 60
 The district court awarded interest on the refunds from the date of the ASCS's final determinations. The United States claims, on the basis of 7 C.F.R. Sec. 722.812(k) and the general policy underlying awards of prejudgment interest, that interest should run from the date of the program payments. 7 C.F.R. Sec. 722.812(k) provides:
 
 
 61
 Payments to any producer which exceed the total payment he earns under the program with respect to any farm shall be refunded to the Commodity Credit Corporation, and if for any reason such earned payment is zero, he shall pay interest at the rate of 6 percent per annum on the amount of the refund from the issue dates of the sight drafts to the date the payments are refunded....
 
 
 62
 The basic interest statute under federal law, 28 U.S.C. Sec. 1961, provides:
 
 
 63
 Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment, at the rate allowed by State law.
 
 
 64
 The district court, in awarding interest from the date of the final administrative judgment, apparently relied on this statute, although an argument could be made that the statute only authorized an award of interest from the date of judgment in the district court. Regardless of the merits of this argument, we believe the district court erred in denying interest from the dates the subsidies were paid.[5]
 
 
 65
 The statute does not limit successful plaintiffs to interest from the date of their judgments. Rather it indicates that the judgment itself will bear interest, as a matter of law, from the date it is entered, and leaves to other principles of law the issue of whether the judgment itself will include prejudgment interest as part of the plaintiff's compensation. As stated in Louisiana & Ark. Ry. Co. v. Export Drum Co., 359 F.2d 311, 317 (5th Cir.1966), "Sec. 1961 ... has nothing to do with the question of whether prejudgment interest shall be allowed as part of the compensation awarded to make the injured party whole."
 
 
 66
 Illinois Central Railroad Co. v. Texas Eastern Transmission Corp., 551 F.2d 943, 944 (5th Cir.1977).
 
 
 67
 As a matter of federal law, see Export Drum Co., supra, prejudgment interest is clearly warranted. First, the regulation in effect at the time the subsidies were paid required prejudgment interest, and appellants, by participating in the program, can be said to have submitted to this condition. Second, "a sum certain is in controversy. As the common law recognizes in analogous situations, the only way the wronged party can be made whole is to award him interest from the time he should have received the money." Id. at 317. The United States has been wrongfully deprived of these funds since 1973. To deny the government prejudgment interest would grant appellants a windfall equal to the value of the use of the funds since that time. Accordingly, we reverse the district court's award of interest and remand with instructions to enter an award of interest of 6% from the date the subsidies were paid.
 
 IV. CONCLUSION
 
 68
 With thought and comment most candid,
 
 
 69
 affirmance shall now be commanded.
 
 But the court below missed
 
 70
 the prejudgment interest:
 
 
 71
 The cases are therefore remanded.
 
 
 72
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 At this point, the four cases not on appeal here took a separate procedural route
 
 
 [2]
 The full context is:
 Q. ... considerably prior to your appointment as hearing officer you knew that--and this is a direct quote from you--"that those people in Gaines County had bilked the government out of six million dollars."
 A. Yeah.
 Q. Mr. Senechal, how can a man who already believes that act as a fair and impartial hearing officer.
 A. I had no problem acting as a fair and impartial hearing officer.
 Q. Just so you got back that six million dollars that you already knew they had bilked the government out of?
 A. Not necessarily, if they--if they had, after a fair hearing I had made a determination they were not involved of [sic ] any planned action to try to achieve additional financial gain from the program, no.
 Senechal dep. at 307.
 Elsewhere in his deposition, Senechal gave the following testimony:
 Q. But you had pretty well decided before you were a hearing office[r] [sic ] that a lot of these things were wrong, and until the individuals came in and established their innocence, as far as you were concerned, they had violated the regulations.
 A. Well, I think the results we got from the investigation established that there was something drastically wrong. I did not pin it down to any individual at that point in time because of the fact that we still had the appeal regulations, and whatever determination was made by Mr. Adams, acting for the county committee, that individual, whoever the adverse determination was made, had the right to appeal all the way to Washington. But we did not make any--I did not make any predeterminations on any particular case.
 Dep. at 249.
 
 
 [3]
 But see Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970) (pretermination hearing required where the termination of welfare "may deprive an eligible recipient of the very means by which to live while he waits.")
 
 
 [4]
 Appellants apparently object to the government's use of investigative reports to support the refund determinations. As the government points out, the investigators' value as witnesses was minimal, as they merely compiled farm records and obtained sworn witness statements. The source of each fact was identified in the reports and became a part of the record. Had the appellants wished to challenge anything in the reports, the appropriate point of attack would have been either the witnesses themselves--most of whom resided in and around Gaines County--or the farm records
 
 
 [5]
 Appellants have not contested the United States' cross-appeal on interest