**Roy and Renee VANDERVELDE, Plaintiffs,**

v.

**Mike ESPY, Secretary, The United States Department of Agriculture, Defendant.**

Civ. A. No. 90–1372–LFO.

United States District Court, District of Columbia.

Dec. 13, 1995.

Alexander J. Pires, Jr., Conlon, Frantz, Phelan, Knapp & Pires, Washington, DC, for Plaintiff.

Marina Braswell, Asst. U.S. Attorney, Washington, DC, for Defendant.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

This matter is before the Court on cross-motions for summary judgment as to whether plaintiffs are entitled to payments totaling $1,734,906.40 and subject to a penalty of $26,000 on account of their participation in the Department of Agriculture's now-defunct Dairy Termination Program ("Program"). Congress authorized the Program in order to reduce the milk cow population, and hence the production of milk, in the United States. A Memorandum filed March 2, 1991 described the procedural history to that date of plaintiffs' unsuccessful administrative claims that they were entitled to payment pursuant to a contract which obligated them to export or sell for slaughter their entire herd of 1,224 milk cows. The Memorandum also reviewed defendant's decision not to make the payment because, among other things, plaintiffs allegedly failed to brand 11 cows and retained or otherwise failed to export or send to slaughter approximately 175 head from their herd pursuant to a scheme or device. *See Vandervelde v. Yeutter,* 774 F.Supp. 645 (D.D.C.1991). A Memorandum and Order filed April 15, 1992 determined that the hearings preceding the earlier administrative decision were not conducted in the manner deemed most likely to obtain the facts as required by Department regulations. *See Vandervelde v. Yeutter,* 789 F.Supp. 24 (D.D.C.1992). The Memorandum expressed concern that "an aura of community vendetta emanates from this record and from the possible disproportionality between the plaintiffs' alleged offense and the $1,700,000 sanction visited upon them." *Id.* at 26. Accordingly, the Memorandum remanded the matter to the defendant for further administrative proceedings.

The defendant's National Appeals Division ("Division") conducted two-plus days of hearings at which the Division accorded plaintiffs full opportunity to produce documentary evidence and to produce, subpoena, and cross-

examine witnesses, including expert testimony that one of the plaintiffs was mentally ill and not legally responsible for his actions and omissions. A.R. at 782. On June 24, 1994, the Division made a determination that plaintiffs violated the terms of their contract and participated in a "scheme or device" designed to defeat the purposes of the Program. The Division essentially reiterated the earlier ruling with respect to contract payments, but reduced the penalty from $871,000 to $26,000. With the administrative proceedings complete, the pending motions focus on the merits of the administrative decision and the authority of a court to review it.

## II.

### A.

Resolution of the pending motions revolves around the provisions of acts of Congress providing for price support, and a corollary reduction in production, of milk. *See* 7 U.S.C. § 1446(d) and 7 C.F.R. § 1430 *et seq.* promulgated by the Secretary of Agriculture pursuant to the statute. Congress limited the Program to an 18–month period beginning April 1, 1986. The statute authorized the Secretary of Agriculture to contract with a milk producer "for the purpose of terminating the production of milk by the producer" in return for a payment to be made by the Secretary. 7 U.S.C. § 1446(d)(3)(A)(ii). The statute contemplated that each contract would require the producer to sell for slaughter or for export "all the dairy cattle in which such producer owned an interest" and precluded a producer for a period of 3 to 5 years from acquiring "any interest in dairy cattle or in the production of milk." 7 U.S.C. § 1446(d)(3)(A)(iv)(I–II). Subsection (3)(A)(iv)(III) provided that "if the producer fails to comply with such contract, the producer shall repay to the Secretary the entire payment received under the contract." The statute authorized civil penalties of $1,000 to $5,000 per head of cattle for various Program violations. 7 U.S.C. § 1446(d)(5)(B). Subsection (5)(A) authorized the Secretary and/or the Attorney General to bring a civil action in a district court to enforce or prevent violation of any regulation issued pursuant to the statute.

Section 1430.450 of the regulations reiterated the statutory "purpose of the program . . . to achieve reductions in the quantity of milk marketed for commercial use" and authorized the Secretary's delegate to "enter into contracts with producers . . . to sell their dairy cattle for slaughter or export and terminate milk production for a five-year period." To this end Section 1430.457(a) required a participating producer to sell for slaughter or export all dairy cattle "in which any such producer or related person had an interest." Section 1430.458 obligated the producer to brand all dairy cattle subject to a contract and precluded a producer from participating in more than one intermediate sale of any herd of cattle between the contract date and its expiration. In the enforcement of the participating producer's obligation to sell or export the dairy cows, the regulations required him to report to the Secretary's delegate the details of each slaughter or export. 7 C.F.R. § 1430.458(h). Critical here is the provision that the Secretary's delegate shall make payments on a contract "only if it has been determined that there has been compliance with all of the terms and conditions of the regulations and the contract. If any terms, conditions, or requirements . . . are not met . . . no further payments shall be made. . . ." 7 C.F.R. § 1430.459. Section 1430.468(g) placed the burden on "participating producers to establish compliance with the requirements of the contract." In addition, Section 1430.461, unlike the statute, addressed "misrepresentations, scheme and device, and fraud." This "fraud" provision rendered ineligible for payments "any participating producer [who] has misrepresented any fact or has adopted, participated in, or benefitted from, any scheme or device which has the effect of, or is designed to, defeat the purpose of this subpart and/or the contract."

Of central interest is a provision authorizing discretionary relief for failure to comply with the terms of the contract. This provision is applicable "only to producers who are determined to have made a good faith effort to comply fully with the terms and conditions

of the program and rendered substantial performance." 7 C.F.R. § 791.2.

### B.

The authority of a court to review a decision by the Division under the Program is governed by the Administrative Procedures Act, 7 U.S.C. § 1385 and § 1429, and the Due Process Clause of the Constitution. Section 1385 provides in relevant part:

> The *facts* constituting the basis for any ... payment under ... price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government.... [emphasis added]

Section 1429 provides that "*[d]eterminations* made by the Secretary under this Act shall be final and conclusive...." [emphasis added]

■ Thus, Congress determined that with respect to the Program decisions by or on behalf of the Secretary, findings of fact, in and among themselves, are "final and conclusive" when officially determined "in conformity with the applicable regulations." Our Court of Appeals expressly recognizes that Section 1385 precludes judicial review of fact findings to which that section applies. *Esch v. Yeutter*, 876 F.2d 976, 990–91 & n. 156 (D.C.Cir.1989); *accord United States v. Batson*, 782 F.2d 1307, 1311 (5th Cir.1986) ("[F]inality attaches in these cases only to those findings of fact that constitute the basis for program payments."). *See also Wardlaw Farms, Inc. v. United States*, 32 Fed.Cl. 475 (Ct.Cl.1992). As plaintiffs have enjoyed ample opportunity to subpoena and cross-examine witnesses as contemplated by the April 15, 1992 decision, *Vandervelde v. Yeutter*, 789 F.Supp. 24 (D.D.C.1992), Section 1385 applies and the Division's factual findings are unreviewable.

■ The literal language of Section 1429 suggests there is also no judicial review of an agency's "determinations" concerning price support programs. However, the Administrative Procedures Act creates a presumption of reviewability of such determinations under the "arbitrary and capricious" standard. Thus, *Batson* emphasized that "only" the findings are unreviewable. 782 F.2d at 1311. *See also Esch v. Lyng*, 665 F.Supp. 6, 12–13 (D.D.C.1987), *aff'd*, 876 F.2d 976 (D.C.Cir. 1989). Although the Division's "findings of fact" remain unreviewable, its "determinations" are reviewable and reversible if "arbitrary and capricious." *See Peterson Farms I, California Partnership v. Espy*, No. 92–1205, 1992 WL 118370, *aff'd*, 15 F.3d 1160 (D.C.Cir.1994) (per curiam) (unpublished). Accordingly, the ultimate question for decision here is whether the Division's determinations that plaintiffs violated the contract and were not entitled to a good faith waiver were "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

### III.

#### A.

In its June 24, 1994 decision, the Division ruled that plaintiffs are "solely responsible for proving they have complied with the terms of the DTP contract." A.R. at 792. Concluding that they had failed to carry that burden, the Division made two categories of factual findings: 18 "Preliminary Findings" ("PF") and 15 "Operative Findings" ("OF"). Administrative Record ("A.R.") at 777–80. Those Preliminary Findings which are directly relevant establish that as of March 31, 1986, plaintiffs contracted to participate in the Program with a view to slaughtering or exporting their entire 1,224 herd on or before February 27, 1987. PF No. 1. At the end of the period, when plaintiffs terminated their dairy operation, the herd had increased by "only" 13. PF Nos. 3–5. On March 16, 1987, plaintiffs certified that they had slaughtered all 1,224 head. PF No. 4. On April 10, 1986, plaintiff Roy Vandervelde drove a truck transporting 11 unbranded cows and was "involved in an accident, after which the 11 cows were branded and taken directly to a slaughter house." PF Nos. 6–7. And also: "Renee vander Velde admitted lying about the source

and amount of money loaned to Roberts for his purchase of 125 cattle from Luscher after Appellants became participants in the DTP." PF No. 15.

The Division made Operative Findings that the "charges in this matter were not the product of a community vendetta but resulted from facts raising serious questions about compliance" with the Program. OF No. 2. "The decision in this case is consistent with other previous decisions with respect to issues" under the program. OF No. 3. The representations made by plaintiffs that there were full and proper dispositions of the animals subject to the contract were false and known by plaintiffs to be false when the representations were made. OF No. 4. Both plaintiffs were capable of understanding their obligations under the contract at the time it was supposed to be performed. OF No. 5. "Appellants have disposed of their records despite the ongoing nature of the controversy." OF No. 11.

The Division further found that the 11 cows involved in the accident were not branded at the time and were "knowingly taken from [plaintiffs'] farm to be sold for purposes other than slaughter or export." OF No. 8. Six other cows were sold to one Kundert, 41 cows sold to one Kalsbeek, and 125 cows sold to one Roberts. The Division found that these cows belonged to plaintiffs, were subject to the Program, and were "knowingly not sold for slaughter or export and [were] not disposed of by slaughter or export by the time set by the [Program] contract" as "part of a scheme or device to defeat the [Program]." OF Nos. 9, 13, 14. "The small increase in the cattle numbers represented to have occurred over the life of the [Program] contract is not possible in a dairy operation given normal reproduction cycles for a herd of the size involved here." OF No. 15. "The only purpose [of plaintiffs] for providing incorrect information would be the purpose of evading the provisions of the [Program]." *Id.*

The defendant presented an intermediate "determination" as part of its "analysis." With respect to the 41 cows acquired by Kalsbeek, the analysis concluded from direct documentary evidence that plaintiffs owned

and disposed of 3 of the 41 cows, and concluded from circumstantial evidence, including inferences and hearsay, that plaintiffs owned the balance of the 41 cows during the contract period and sold them to Kalsbeek knowing that he would neither destroy nor export them. A.R. at 786–87. With respect to the 125 cows sold to Roberts, the Division concluded, from circumstantial evidence and plaintiffs' failure to come forward with proof, that the 125 cows belonged to plaintiffs. A.R. at 787–88. The Division found corroboration for these determinations from what it determined to be the remarkably small increase in the herd during the contract period; several false statements by plaintiffs; and from the unexplained unavailability of required records with which plaintiffs could have, but did not, carry their burden of proof.

### B.

On the basis of this analysis, the Division determined ultimately that "there was an intentional failure to properly dispose of animals that were required to be branded and slaughtered, which constitutes violations of 7 C.F.R. §§ 1430.457–58 and disqualifies Appellants for DTP payments. (7 C.F.R. § 1430.459, § 1430.462)" A.R. at 782. The Division also concluded that "the regulations specifically stipulate the burden shall be on participating producers to establish compliance with the DTP contract and regulations. As previously indicated, Appellants have clearly failed to meet this burden and are not entitled to payments under the DTP." A.R. at 790. Furthermore, the Division determined that plaintiffs were not eligible for any payment because, in addition to failing to establish compliance with the contract, they "participated in a scheme or device designed to defeat the purposes of the [Program] and . . . made misrepresentations for the purpose of causing the [department] to make payments under the contract that otherwise would not have been made."

The Division also determined that, based upon plaintiffs' violations, a $871,000 penalty was appropriate. The Division recognized, however, that it had denied to plaintiffs a relatively large payment ($1,734,906.40) and

that plaintiffs had admitted fabrications about the 125 cows transaction with Roberts. For these reasons, and without any specific finding about good faith or the lack of it, the Division eliminated all of the penalties except with reference to the 11 unbranded cows in the accident ($11,000) and the 3 cows out of the 41 sold to Kalsbeek ($15,000), which were traceable by direct evidence to plaintiffs, thereby reducing the total penalty from $871,000 to $26,000. A.R. at 792–93.

## IV.

The Division's decision rests on two separate and independent grounds: (1) the plaintiffs' failure to comply with the contract; and (2) their participation in a "scheme or device" and lack of good faith in defeating the purposes of the Program. Federal courts generally require "proof of civil fraud" by "clear and convincing evidence." *See Shepherd v. American Broadcasting, Inc.,* 62 F.3d 1469, 1477 (D.C.Cir.1995) (Tatel, J.). As the *Shepherd* Court explained in a related context, when there are "allegations of fraud *or some other quasi-criminal misconduct,*" a heightened standard of proof is appropriate because " '[t]he interests at stake in those cases are deemed to be more substantial than mere loss of money . . . .' Proof of civil fraud in general therefore requires clear and convincing evidence." *Id.* at 1477 (quoting *Addington v. Texas,* 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979)) (emphasis added). There is also a Due Process Clause constitutional dimension to the issue of what standard of proof to apply. As the Supreme Court has explained,

> The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.

*Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323 (1979) (internal citations omitted) (quoting *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (1979) (Harlan, J., concurring)).

Here, there was both a loss of money and a stigmatizing of plaintiffs—for example, the Division's determinations that plaintiffs lacked good faith, made false statements, and participated in a "scheme or device" to defeat the Program. Here, the regulations not only failed to impose a clear and convincing, or any other heightened, standard of proof upon the Division, they also placed the burden of proof upon the persons accused of quasi-criminal conduct. 7 C.F.R. § 1430.468; *see* A.R. at 792 (stating that plaintiffs "are solely responsible for proving they have complied with the terms of the D.P. contract"). Here, the Division based its decision to deny plaintiffs their contract payments, in part, on its finding that plaintiffs participated in a "scheme or device" to defeat the purposes of the Program and necessarily determined that their violations were not in good faith. That Section 1385 precludes judicial review of the Division's factual findings only heightens the due process concerns emanating from the Division's failure to apply the clear and convincing evidence standard in its finding that plaintiffs participated in a "scheme or device" and the necessary inference that they acted in bad faith.

While the application of the "clear and convincing" evidence standard to the Program presents an issue of first impression in this Circuit, the Court of Appeals' decision in *Shepherd* holds that "[p]roof in civil fraud in general requires clear and convincing evidence." As the Division ruled, in part, that plaintiffs defrauded the Department and had the burden of proof to prove otherwise, it would seem that under the Due Process Clause and the Court of Appeals' ruling in *Shepherd,* that this part of the Division's decision cannot stand.

Ordinarily, if this were the only ground for the Division's ruling, it would be appropriate to remand this matter once again for further consideration by application of a "clear and convincing" standard. However, the case has already been remanded once. More importantly, the Division's decision rests on two separate and independent grounds, only one

of which concerns plaintiff's participation in a "scheme or device." The Division repeatedly and consistently points to plaintiffs' failure to comply with the terms of their Program contract as a separate and independent reason for holding plaintiffs ineligible to receive any payments under their contract. The Division states, "It is our conclusion as we set out below that there was an intentional failure to properly dispose of animals that were required to be branded and slaughtered, which constitutes violations of 7 C.F.R. § 1430.457–58 and disqualifies [plaintiffs] for DTP payments. (7 C.F.R. § 1430.459, § 1430.462)" A.R. at 782; *see also* A.R. at 789, 790, 792. Reading the opinion in its entirety, it is clear that the Division relied upon—and plainly cites—7 C.F.R. § 1430.459 and 7 C.F.R. § 1430.462 to hold plaintiffs ineligible for Program payments. These regulations state that compliance with "all the terms and conditions of the regulations and the contract" is a condition to receiving any payments under the contract and do not mention "scheme or device." That the Division based its decision on the contract violations *per se* separate and independent from the "scheme or device" violation is corroborated by the Division's statement that: "We *also* find a scheme or device to defeat the DTP and actional misrepresentations which are *also* disqualifying under the provisions of 7 C.F.R. § 1430.461." A.R. at 782 (emphasis added).

Thus, the Division ruled that plaintiffs were ineligible for Program payments because of their failure to comply with the terms of their contract in two transactions, albeit relatively small ones, independently of its decision on the "scheme or device" issue. Accordingly, it is unnecessary to reach the issue whether the Division's ruling that plaintiffs participated in a "scheme or device" required proof by "clear and convincing" evidence.

## V.

A question remains as to whether it was "arbitrary and capricious" for the Division to deny plaintiffs any payments under their Program contract for their violations. Plaintiffs argue that the defendant abused its discretion in refusing to pay plaintiffs under

their contract even though plaintiffs admittedly did not comply fully with its terms. *See* Plaintiffs' Motion at 37–45. Defendant responds that the statute and the regulations clearly require claimants to prove full compliance as a predicate to payment on a Program contract; and plaintiffs did not prove full compliance. Defendant relies upon the provisions of the regulations that "[i]f any terms, conditions, or requirements of the contract are not met, payments previously made by CCC shall be refunded and no further payments shall be made by CCC." 7 C.F.R. § 1430.459. "In the event that there is a failure to comply with any term, requirement, or condition for payment arising under the contract ... all payments made under the contract to any person shall be refunded to CCC...." 7 C.F.R. § 1430.462.

As an ultimate basis for relief, plaintiffs invoke the "good faith" provision of the regulations which authorizes payment to technical violators of the Program whom the Division determines, nevertheless, to have acted in good faith. 7 C.F.R. § 791.2 ("[This provision] shall be applicable only to producers who are determined to have made a good faith effort [but failed] to comply fully with the terms and conditions of the program and rendered substantial performance."). The Division determined, however, that plaintiffs did not show good faith and therefore did not meet the requirements for good faith relief. A.R. at 782.

In making this determination, the Division placed the burden of proving good faith upon the plaintiffs: a "good faith effort to comply must be demonstrated." A.R. at 782. The Division never suggested that defendant might have the burden of persuasion based on "clear and convincing" evidence that defendants' violations were not in good faith. *Compare Shepherd, supra.* The Division did find and determine, however, that plaintiff Renee Vandervelde's actions "could never be characterized as a good faith effort." A.R. at 782. Also, the Division determined with respect to the accident involving the 11 cows that "the *overwhelming* evidence suggests an intentional lack of good faith." A.R. at 784 (emphasis added). The foregoing findings and determinations are supported by, for

example, the evidence of fabrications and lost records. *See, e.g.,* A.R. at 778 (PF No. 15: "Renee vander Velde admitted lying about the source and amount of money loaned to Roberts for his purchase of 125 cattle from Luscher after Appellants became participants in the D.P.."); A.R. at 779 (OF No. 11: "Appellants have disposed of their records despite the ongoing nature of the controversy."). In these circumstances, the Division's failure to recite the rubric "clear and convincing" cannot distort the obvious: the Division determined the lack of good faith on the basis of the functional equivalent of clear and convincing evidence, most of which was produced by the defendant. Thus, the Division determined that plaintiffs were not entitled to any payment by operation of any waiver of the consequences of their contract violations. In all the circumstances, there was no actual misplaced burden of proof or persuasion on this issue.

Finally, plaintiffs argue that even apart from the good faith provision of 7 C.F.R. § 791.2, the defendant could and should modify or grant relief from complete contract forfeiture. "There is no doubt that penalties could have been modified upon any level of appeal." Plaintiffs' Motion at 37. They impliedly argue that defendant administers the waiver provision arbitrarily and capriciously. Plaintiffs cite to and summarize a number of administrative cases arising under the Program in which the defendant reduced the penalties in some cases because, allegedly, it was felt they were too harsh and severe. *See* Plaintiffs' Motion at 41–44 & Exhibit D. Yet, *in two of the three cases plaintiffs refer to,* the Division made an explicit finding as to good faith.[1] An analysis of the administrative cases in general reveals many cases in which the Division denied contract payments on the basis of failure to comply fully with its terms.[2] And in the majority of cases in which contract violators were assessed only monetary penalties and were still paid pursuant to their contracts, the Division made explicit findings as to good faith.[3] In the instant case, the Division stated that the "overwhelming evidence" did not support a finding of good faith and therefore plaintiffs could not be relieved of contract forfeiture. Based on plaintiffs' own proffered evidence, the Division's decision is not "arbitrary and capricious," but is consistent "with other previous Deputy Administrator decisions with respect to issues under the DTP." OF No. 3.[4]

Precedent, albeit from another circuit, confirms this conclusion: in *Sybrandy v. United States Dep't of Agriculture,* a case arising under the Program, plaintiffs signed a Program contract which stipulated that participating milk producers not "make available" for milk production the producers' facilities for five years. 937 F.2d 443, 447 (9th Cir. 1991). After signing the contract and receiving part payment, plaintiffs defaulted on their mortgage. The landlord foreclosed on the property, and plaintiffs lost control of their farm. The landlord subsequently leased the land to another dairy farmer, who began dairy production. *See id.* at 445. Shortly thereafter, the Department notified plaintiffs that they were in violation of their contract because their land was being used to maintain dairy cows. Plaintiffs argued that they were no longer in control of the land and so could not be found in violation of their contract.

The Court of Appeals for the Ninth Circuit held that plaintiffs did indeed violate their contract and that this violation—which occurred beyond plaintiffs' control—meant that plaintiffs were obligated to return all contract payments and, in addition, to pay a $1,000 penalty. *See id.* at 446. The result in *Sybrandy* is the same as in other cases handled administratively and proffered by plain-

---

1. *See* Hop; Miller.

2. *See, e.g.,* Winters Farm; Kirkendall; Doty; Martin; Sol; Juckoff; Nash Spread Partnership; Gaede; Sybrandy; Putnam; Meinders; Simons.

3. *See, e.g.,* Miller; Triple T Dairy; Gorzeman; Husser; Andrews; Hop; Tofstad.

4. Of the 42 administrative cases summarized in Exhibit D of Plaintiffs' Motion: in those cases in which the Department withheld contract payments, only 1 dairy producer was mentioned to have shown good faith. In those cases in which the Department assessed penalties only and did not withhold contract payments, 8 of 14 were mentioned to have shown good faith.

tiffs in Exhibit D of their motion for summary judgment as administrative precedent from which to judge whether the Division's actions in the instant case are "arbitrary and capricious." *See, e.g.,* Kirkendall; Juckoff; and Putnam (all factually similar to *Sybrandy* ).

 The Division's application of the statute and the regulations reaches a harsh result. A reviewing court has the authority and the responsibility to protect participating producers against arbitrary and capricious administration of the Program and any "clear error of judgment." *See, e.g., Citizens to Preserve Overton Park, supra; Peterson Farms I, California Partnership, supra;* and *Esch v. Lyng, supra.* It bears reminding, however, that a "court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416, 91 S.Ct. at 824. Because the Division's decision is consistent with other administrative decisions arising under the Program and because the statute and regulations plainly mandate that "[i]f any terms, conditions, or requirements of the contract are not met, payments previously made by CCC shall be refunded and no further payments shall be made by CCC" in the absence of a finding that plaintiffs acted in "good faith," the Division's ruling is neither "arbitrary" nor "capricious." 7 C.F.R. § 1430.459. The Division correctly applied these regulations to its findings of fact and correctly ruled that plaintiffs were disqualified from receiving any payments under their Program contract. A.R. at 782.

### VI.

Defendant counterclaims for the $26,000 penalty and has also moved for summary judgment on that issue. Plaintiffs concede that they "should be assessed a fair and reasonable penalty" that is "based upon the $1000/$5000 penalty provisions found in the DTP contract, statute and regulations." Plaintiffs' Motion at 45. Plaintiffs thus effectively concede that the $26,000 penalty is "fair and reasonable." Indeed, the penalty is based upon the contract violations for which the Division has direct evidence relating to the 11 cows involved in the accident and 3 of the 41 cows sold to Kalsbeek.

Accordingly, an accompanying Order denies plaintiffs' motion for summary judgment and grants defendant's motion for summary judgment.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is this 12th day of December, 1995, hereby

ORDERED: that plaintiffs' motion for summary judgment should be, and is hereby, DENIED; and it is further

ORDERED: that defendant's motion for summary judgment on plaintiffs' claims and on defendant's counterclaim should be, and is hereby, GRANTED; and it is further

ORDERED: that plaintiffs' amended complaint should be, and is hereby, DISMISSED WITH PREJUDICE.