Patrick ESCH, et al., Plaintiffs,

v.

Richard LYNG, Secretary of Agriculture, Defendant.

Civ. A. No. 87–0885.

United States District Court, District of Columbia.

June 5, 1987.

Order July 21, 1987.

Memorandum Opinion July 22, 1987.

Alexander J. Pires, Jr., Kevin F. Meckus, Scott, McLeod, Himmelberg, Matz, Pires & Price, Washington, D.C., for plaintiffs.

Charles F. Flynn, John M. Facciola, Asst. U.S. Attys., Terrence C. Jackson, Office of General Counsel, Dept. of Agr., Washington, D.C., for defendant.

## OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiffs, nine brothers and sisters whose family has farmed for 115 years in the United States, are the owners of L.J. Farms, a partnership. Their 20,000–acre wheat and corn farm is located in Baca County, Colorado. Late in 1986, without prior formal notice, defendant United States Department of Agriculture (USDA) suspended plaintiffs from participation in certain federal support programs and withheld payments under them. This declaration of ineligibility immediately threatened the future viability of plaintiffs' farm. As a result of defendant's actions, plaintiffs' creditors have repossessed most of their farm equipment and have instituted fore-

**8**

closure proceedings. Without relief from this court, plaintiffs will lose their farm in less than three weeks. Recognizing the dire threat posed by their suspension, plaintiffs sought administrative review at the local, state, and national levels. Although they were given an opportunity to speak on their own behalf during these proceedings, plaintiffs were not apprised of the official reasons for their suspension until they reached the national office, and at no time were they given an opportunity to confront or rebut the evidence or witnesses upon which the agency relied in reaching its decision. Having exhausted their administrative remedies, plaintiffs initiated this suit, alleging that defendant's actions were arbitrary, capricious, and an abuse of discretion and violated their due process rights. They seek, by way of preliminary relief, a declaration of eligibility for the subsidy programs in question. For the reasons set forth below, the court will grant that request.

In 1979, plaintiffs sold certain Nebraska farmland that their father, Laurence Esch, had given them, and used the proceeds— some $300,000—as a down payment on a Baca County farm owned by the Baca Land and Cattle Company. In 1981, plaintiffs filed with USDA's local office, the BACA County Agricultural Stabilization and Conservation Service (ASCS) Committee, to participate in the USDA's farm programs as a nine-person farm. "Person" determinations are central to the administration of the farm programs at issue in this case. Both the annual price support programs established for certain crops under the Agricultural Act of 1949 and the Conservation Reserve Program (CRP) established in 1986, limit the total amount of payments that any one person may receive from the USDA within a single year. For the price support programs, 7 U.S.C. § 1308 sets a total limit of $50,000 on payments for wheat, feed grain, upland cotton, extra long staple cotton, and rice.[1] Under the CRP, a program in which the government in effect "rents" farm property by contracting with farmers to take their land out of production for 10–year periods, 16 U.S.C. § 3834(f), limits the amount of such rental payments to $50,000 per person per year. CRP payments, however, are in addition to, and not in substitution for, price support payments. Section 1308(5)(A) of Title 7 directs the Secretary of Agriculture to issue regulations defining "person" for purposes of payment limitations. These regulations, which appear at 7 C.F.R. § 795.7, state in essence that members of a partnership may be considered "persons" for payment purposes if they each contribute a commensurate share of land, labor, management, equipment, or capital to the partnership. 7 C.F.R. § 795.7. For "person" determination it is sufficient that any one of the foregoing criteria is met.

In 1981, the county committee accepted plaintiffs' application as a nine-person partnership, and plaintiffs received benefits accordingly. The following year, however, the committee reconsidered its earlier determination and reduced plaintiffs to a four-person entity. As a result, plaintiffs reimbursed defendant for the excess benefits they received in 1981, and the five family members whose participation had been disallowed sold their interest in the farm to the remaining four, taking a note in the amount of $300,000 for their interest in the property. In 1983 and 1984, plaintiffs applied to the county committee and were paid as a four-person farm; during these same years, they filed federal tax returns which also reflected that the farm was run as a four-person partnership.

Due to bad weather, the farm did not prove particularly profitable during the first years of its operation, and plaintiffs fell behind in their payments to the Baca Land and Cattle Company. In order to shore up their sagging financial situation, the four partners tried, beginning in 1982, to secure a loan from the Farmers Home Loan Administration (FmHA), an agency of

---

1. The current provisions of section 1308 apply to the 1986 through 1990 crops of these commodities. 7 U.S.C. § 1308 (Supp.1985). A similar limitation applied under section 1308 for the 1982–1985 crops. The present case straddles both the old and revised statutes since it involves claims for the 1984 crop year through the present.

defendant. In 1983, FmHA tentatively approved a loan on the condition that all four partners pledge their homes as collateral. When the wives of two of the four balked at this requirement, however, FmHA withdrew its offer. Patrick and Dennis Esch, the two brothers who were willing to pledge such collateral, approached FmHA again in 1984 in an effort to negotiate an acceptable loan. Dennis Esch testified at a hearing held before this court that local FmHA officers, who worked adjacent to and closely with the county committee in this community of 600 people, suggested that a loan could be arranged if he and his brother Patrick applied for the loan and pledged their homes, and the other two brothers withdrew from the application. Patrick and Dennis followed this suggestion and obtained a loan of $800,000. That same year, of course, the Esches applied with the county committee for price support benefits as a four-person farm. They saw no inconsistency between this four-person application and the two-person application filed with the FmHA and made no effort to hide these facts from either office; indeed, they were confident that both offices were well aware of the two filings.

The Esches' financial difficulties did not end, however, with the infusion of cash from the FmHA loan. They still owed approximately $4.5 million to the sellers of the property and remained behind in their payments. The sellers in turn offered plaintiffs a $1.3 million discount if they paid off the balance of their debt by June 1984. Plaintiffs attempted unsuccessfully to raise the necessary funding from commercial lenders and turned, apparently as a last resort, to their father. Laurence Esch refused to make the loan to just four of his children, however; instead, he agreed to provide the necessary financing to all nine children, but only if they shared all financial obligations equally. As a condition of the loan, the five brothers and sisters who had previously withdrawn from the partnership had to contribute their $300,000 note. Laurence Esch then loaned each of the nine $114,000, taking as security for each loan a pledge of the farm assets. Plaintiffs paid off the sellers of the property, and the four brothers who had made up the four-person partnership received a warranty deed which conveyed the farm and its assets to them. In September 1984, plaintiffs executed a partnership agreement among themselves in which the four brothers sold the farm and all of its equipment, liabilities, and other assets to the new nine-person partnership.

In 1985 and 1986, plaintiffs applied with the county committee as a nine-person entity and received advanced deficiency payments under the price support programs for those years in accordance with that filing. Similarly, plaintiffs' federal tax returns for those years stated that they were a nine-person partnership. In 1986, two years after plaintiffs had formally become a partnership of nine, USDA implemented the CRP and plaintiffs submitted a bid to participate in that program as well, again as a nine-person farm. Defendant accepted plaintiffs' bid in April 1986 and executed a CRP contract that obligated plaintiffs to take approximately 12,000 acres of the farm out of production. In accordance with the payment limitation of 16 U.S.C. § 3834, plaintiffs received some $430,000 under the contract in 1986.

In August of that year, defendant's Office of Inspector General (OIG) began an audit of the Baca County ASCS. Word of the audit spread quickly through the Baca County farming community, and Patrick and David Esch traveled to Denver in September to seek the advice of the State ASCS with respect to their CRP obligations. The two were apparently concerned that if their contract were deemed invalid for any reason, they would lose both the $450,000 in CRP payments and the opportunity to farm 12,000 acres of land, which could be planted with wheat in the fall. They were advised that their CRP contract was in effect unless and until the state office said otherwise; plaintiffs therefore forsook the opportunity to plant wheat. In October, however, they did not receive any CRP or price support payments. Instead, they were told that all such payments, which then amounted to $628,000, were being suspended until OIG

completed its audit of their filings with the county committee. OIG apparently finished its review in December 1986, though plaintiffs were not furnished a copy at that time.[2]

The auditors determined that plaintiffs were one person for deficiency payment purposes and two persons for CRP purposes and that the Baca County ASCS should recover overpayments made in 1984 and 1985 and limit 1986 payments. On January 16, 1987, the State ASCS adopted the findings of the OIG audit without providing plaintiffs notice or a hearing; indeed, plaintiffs were not even informed of the reasons underlying the auditor's determinations, despite the fact that the audit had the immediate effect of jeopardizing the continued existence of their farm. Plaintiffs appeared before the State ASCS on February 2, 1987, seeking reconsideration of its decision. Although plaintiffs were afforded an opportunity to be heard, the only evidence defendant offered at that hearing was a summary of the audit. Following the hearing, the State ASCS declined to resolve the matter, and instead forwarded the case to the ASCS's Deputy Administrator for State and County Operations (DASCO) in Washington. Thirty days later, before plaintiffs submitted any evidence, DASCO concurred in the audit without explanation. Plaintiffs filed for reconsideration of that decision on March 20 but, because their creditors had initiated foreclosure proceedings against them, plaintiffs filed this suit on March 31, before DASCO held any hearing on their appeal.

Following a hearing on their application for a temporary restraining order, Judge Sporkin denied plaintiffs' injunctive relief. The parties agreed, however, to an expedited administrative hearing before an ASCS appeals officer. That hearing was held on April 7 by Appeals Officer Carolyn Burchett and a written decision followed on April 15. In that decision, DASCO stated that plaintiffs "failed to disclose accurate or complete information to the county com-

mittee" in 1984, and that during that year they had "provided conflicting information to two federal agricultural agencies." April 15, 1987 Decision at 3, 4. The agency further found that the 1984 loan and conveyance were simply a "series of paper transactions [resulting in] no substantive change in the farming operations." *Id.* at 2. Accordingly, DASCO concluded that plaintiffs constituted a one-person partnership for 1984 and that, because they had not made commensurate contributions to the partnership following the 1984 reorganization, that one-person determination applied in 1985 and 1986 as well. Plaintiffs were required to repay USDA for their 1984 payments. However, apparently because the Baca County ASCS had not requested the necessary documentation for the latter two years, DASCO permitted plaintiffs to retain payments for those years. The county committee did demand such information in 1986, though, and DASCO ruled that because plaintiffs failed to provide "timely or accurate information" on their Form 561, they could receive no relief for 1987.

Plaintiffs sought reconsideration of DASCO's refusal to grant relief for the current crop year and appeared again before Appeals Officer Burchett on April 29. One week later, DASCO denied the requested relief, stating that plaintiffs' Form 561 "contained inaccurate and misleading information, which clearly indicates the lack of good faith and could be construed as a device designed to evade the payment limitation rules." May 6, 1987 Decision at 1.

Thereafter, plaintiffs requested a hearing before this court on their motion for a preliminary injunction. In its Motion to Dismiss or, in the Alternative, For Summary Judgment, defendant continues to charge plaintiffs with attempting to deceive the government, stating that plaintiffs "misrepresented" their status in 1984, filed a "false and misleading Form 561," and "concealed information." *See* Defend-

---

**2.** Dennis Esch testified at the hearing before the court that plaintiffs repeatedly requested a copy of the audit, but that defendant failed to provide one until well after plaintiffs had obtained a copy through other channels. The copy they eventually received from defendant was, according to Esch, illegible.

ant's Motion at 24, 25 & 27. At the hearing, plaintiffs offered the testimony of Dennis Esch, who stated that he and his brothers made no effort to conceal the fact that they had filed a two-person application with FmHA in 1984 and a four-person application with the Baca County ASCS that same year; that to the contrary, they assumed that both the local FmHA and ASCS offices knew of the two filings; and that they submitted the two- rather than four-person application with FmHA at that office's *suggestion.* In addition, he testified that the farm's tax returns reflected that it was a four-person enterprise in 1984 and a nine-person entity thereafter. Plaintiffs also offered into evidence a notarized declaration from the members of the Baca County ASCS stating that they do not believe the Form 561 plaintiffs filed in 1986 was either inaccurate or misleading, and that they continue to consider the nine-person determination correct. While defendant insists that this evidence is irrelevant because this court's review is limited strictly to the administrative record, Assistant Deputy Administrator for State and County Operations Thomas Von Garlem acknowledged at the hearing that this evidence was not before the agency either when it suspended payments to plaintiffs or during the appeals that followed.

■ Defendant argues as an initial matter that this court lacks jurisdiction over plaintiffs' claims, which it contends can only be heard in the United States Claims Court. Under the so-called Little Tucker Act, 28 U.S.C. § 1346(a)(2), this court has no jurisdiction over claims against the United States exceeding $10,000 in amount that are "founded either upon the Constitution, or any act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States...." Such claims can only be brought in the Claims Court, whose jurisdiction is subject to no such dollar limitation. *See* 28 U.S.C. § 1491. Defendant is correct that where the primary object of a suit is to recover money damages from the United States in excess of $10,000, the suit is governed by the Tucker Act, and that Act's jurisdictional provisions may not be circumvented simply by framing the complaint as a mandamus action, *Van Drasek v. Lehman,* 762 F.2d 1065, 1071 n. 11 (D.C. Cir.1985), or as a request for declaratory or injunctive relief. *Professional Managers Association v. United States,* 761 F.2d 740, 745 n. 4 (D.C.Cir.1985); *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967 (D.C.Cir.1982). On the other hand, the Claims Court does not have exclusive jurisdiction over a suit merely because it raises contract-related issues. *Spectrum Leasing Corp. v. United States,* 764 F.2d 891, 893 (D.C.Cir.1985); *State of Tennessee ex rel. Leech v. Dole,* 749 F.2d 331, 335 (6th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). "If the declaratory or injunctive relief a claimant seeks has significant prospective effect or considerable value apart from merely determining monetary liability of the government, the equitable relief sought is paramount and the district court may assume jurisdiction over the nonmonetary claims." *State of Minnesota by Noot v. Heckler,* 718 F.2d 852, 858 (8th Cir.1983).

Initially, plaintiffs requested that this court order defendant to pay them $628,000 allegedly owed under the CRP contract and price support programs. That request was unmistakably governed by the Tucker Act and could not be brought in this court. Recognizing this, plaintiffs disavowed at the hearing any interest in recovering, in this court, any sums past due for prior crop years. At present, plaintiffs' complaint is framed as one seeking redress for arbitrary and capricious agency action and violations of their due process rights. By way of relief, they ask that this court declare, on a preliminary basis, that they be considered eligible for receipt of price support and CRP benefits as a nine- rather than a one-person farm. Such a declaration would, if made permanent, have the prospective effect of entitling them to federal benefits; significantly, it would also have the immediate and undeniably valuable effect of allaying the concerns of their various creditors, who would, according to plaintiffs, cease their collection efforts on the strength of such a ruling.

■ The fact that plaintiffs characterize their claim as one challenging arbitrary agency action subject to review under the Administrative Procedure Act (APA), 5 U.S.C. § 702, does not automatically resolve the jurisdictional question, for it is " 'hard to conceive of a claim falling no matter how squarely within the Tucker Act which could not be urged to involve as well agency error subject to review under the APA.' " *International Engineering Co., Division of A-T-O, Inc. v. Richardson,* 512 F.2d 573, 580 (D.C.Cir.1975), (quoting *Warner v. Cox,* 487 F.2d 1301, 1306 (5th Cir.1974)), *cert. denied sub nom. International Engineering Co. v. Rumsfeld,* 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976). This court concludes, however, that it has jurisdiction over plaintiffs' claims as those claims are presently framed. To begin with, plaintiffs are not challenging the validity of their CRP contract or any of its provisions—they are not alleging that defendant has breached that contract nor do they seek damages under it. In essence, they seek a declaration that they are a nine-person farm within the meaning of 7 C.F.R. § 795.7, and that defendant's contrary determination is arbitrary, capricious, and the result of a constitutionally defective decisionmaking process. Wholly apart from plaintiffs' relationship with the government, the relief they request would, if granted, immediately inure to their benefit by placating the creditors who at the moment are threatening to shut down plaintiffs' farm. Nor does the fact that such a declaration may well entitle them to prospective relief from the government in the Claims Court deprive this court of jurisdiction, since the Claims Court does not "possess exclusive jurisdiction simply because a suit for nonmonetary relief may form the basis of a later money judgment." *State of Tennessee,* 749 F.2d at 336; *see also Van Drasek,* 762 F.2d at 1069 n. 4 ("district court has jurisdiction over a nonmonetary claim even though the same facts giving rise to the non-monetary claim would support an action for money in the Claims Court"); *State of Minnesota,* 718 F.2d at 858 ("fact that a suit for nonmonetary relief in the district court may also provide basis for a grant of money damages against the United States is not a sufficient reason to foreclose district court jurisdiction"). Finally, it is possible that the ultimate relief this court orders will simply involve a remand to the agency, which will not entitle plaintiffs to money in the Claims Court, but rather will allow them an opportunity to develop a more complete and accurate record.

In short, the court concludes that the primary purpose of this suit is not the recovery of money damages from defendant. Plaintiffs have eschewed any claims for compensatory damages in this court, and the declaratory relief they request clearly has both prospective and immediate value to them such that this court may entertain their suit.

■ Defendant next argues that under 7 U.S.C. § 1385 this court's review of its "person" determinations is limited to the administrative record, and that findings of fact upon which that decision is based are binding and conclusive. Section 1385 provides in pertinent part that:

[t]he facts constituting the basis for any Soil Conservation Act payment, [and] any payment under the [price support] programs authorized by the Agricultural Act of 1949 ... when officially determined in conformity with the applicable regulations prescribed by the Secretary ... shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government.

7 U.S.C. § 1385. Relying on this provision, defendant objected to any and all testimony and evidence offered at the preliminary injunction hearing on the grounds that, because such evidence was not part of the administrative record, it is irrelevant.

The essence of plaintiffs' complaint, of course, is that the agency acted arbitrarily and capriciously and in violation of their due process rights. Section 1385 does not preclude judicial consideration of such a claim; rather, consistent with the judicial review provisions of the APA, it prevents this court from substituting its judgment for that of the agency and limits the present inquiry to a determination of

whether ASCS "considered all relevant factors" and had a rational basis for its decision. *King v. Bergland,* 517 F.Supp. 1363 (D.Colo.1981). Much of the evidence and testimony proffered at the hearing was directly relevant to this inquiry. Plaintiffs offered evidence demonstrating that they had no intention of deceiving or misleading the Baca County ASCS or FmHA in 1984; that their federal tax returns were consistent with their representations to ASCS concerning the number of persons in the partnership for the years in question; that they did not intend to deceive or mislead the county committee when they filed as a nine-person farm in 1985 and 1986, and that the committee was not deceived, *see* Plaintiff's Exhibit 15; that plaintiffs considered all nine brothers and sisters, not just Dennis and Patrick, liable on the FmHA loan, and the local FmHA shared that understanding of the obligation, *see* Plaintiffs' Exhibit 16; and that Dennis and Patrick Esch filed the 1984 FmHA loan application as two persons rather than four at the suggestion of FmHA.

In its various appellate decisions and its filing with this court, defendant accuses plaintiffs of a "lack of good faith," *see* May 6, 1987 Decision at 1; of filing their 1986 561 Form "as a device designed to evade the payment limitation payment rules," *id.;* and of "conceal[ing] information" and "misrepresent[ing]" facts. Defendant's Motion at 24, 27. Yet in reaching these conclusions, ASCS apparently never interviewed the members of the local FmHA office or the county committee, nor did they investigate all of plaintiffs' relevant federal tax returns.[3] In fact, so far as the record reveals, the principal basis for defendant's charges of false filings, misrepresentation, and deceit was the OIG audit, yet that audit included no interviews with plaintiffs or with the local FmHA or county committee personnel.[4] In short, whatever the merits of defendant's person determination insofar as it concerns the application of 7 C.F.R. § 795.7 to the facts of the 1984 reorganization of plaintiffs' farm, plaintiffs have made a substantial showing that defendant's "bad faith" determinations were not based on consideration of all relevant factors, but were instead premised solely on a review of Baca County ASCS files. The administrative record and the brief defendant filed in this case both strongly suggest that the principal basis for defendant's findings were the inconsistent two-person, four-person filings plaintiffs made in 1984 to FmHA and the county committee respectively. Indeed, it was plaintiffs' provision of this "conflicting information" which led defendant to reduce plaintiffs from a four-person to a one-person entity.[5] Yet, as the facts developed in this case so far reveal, findings of bad faith, deceit, and intentional misrepresentation cannot rest on so slender a reed. A person's state of mind may sometimes be discerned simply from a pair of documents, but under the circumstances of this case, it appears that such a determination could not be made without an investigation of the intent of the alleged defrauders or the effect their alleged misrepresentations had on the rele-

---

**3.** When presented with the notarized declaration of the Baca County ASCS members, Mr. Von Garlem expressed amazement and disbelief at the statements of defendant's own agents, who asserted that they saw nothing improper or misleading in plaintiffs' Form 561. He was also unaware of the representation of any of plaintiffs' tax returns, filed prior to and after inauguration of the 1986 CRP.

**4.** Mr. Von Garlem stated that the government places enormous reliance on decisions of its county committees. There are 3,000 such committees in the United States and they are the front line representatives of the government in our nation's farming communities.

**5.** Moreover, in the April 15, 1987 Decision, DASCO granted plaintiffs relief for the 1985 and 1986 crop years, which involved plaintiffs' nine-person filing, but not for 1984. The decision characterized the 1986 filing as "incorrect," and untimely, but found "no justification for relief [for 1984] since [plaintiffs] provided conflicting information to two federal agencies." April 15, 1987 Decision at 4. While the May 6, 1987 Decision subsequently challenged the 1986 filings as "a device designed to evade the payment limitation rules," May 6, 1987 Decision at 1, this suggestion is completely inconsistent with the record, which revealed that plaintiffs' 1985 and 1986 filings were both based on the 1984 reorganization of the farm, and that the reorganization pre-dated CRP and any payment limitation rules associated with it.

vant audience—investigations which defendant apparently never undertook here. *Cf. United States v. Batson,* 706 F.2d 657, 666–71 (5th Cir.1983) (setting out ASCS' detailed investigation of scheme to defraud government price support program).

Perhaps equally troubling is the fact that nowhere in its various decisions nor at the hearing before this court has defendant identified the standard against which plaintiffs' filings were measured, or how the filings fell short of those standards. Defendant has characterized plaintiffs' 1986 Form 561 and their 1984 applications as "incorrect," "inaccurate," "untimely," "false," "misleading," and, in essence, fraudulent. Both plaintiffs and this court are at a loss to know whether defendant views these terms as interchangeable, whether an untimely submission above is sufficient to warrant payment suspension, or whether any incorrect filing is deemed misleading.[6] This court cannot declare agency action rational when the agency fails to indicate what standards guided the action.

 In short, plaintiffs have demonstrated not only that they are entitled to offer evidence in order to demonstrate the inadequacies of the agency's decisionmaking process, but that they have a substantial likelihood of success on their claim that defendant acted arbitrarily and capriciously in suspending their payments and reducing the number of persons in their farm. Substantial likelihood of success on the merits, of course, is one of the four elements plaintiffs must establish in order to demonstrate the propriety of preliminary injunctive relief. The other three are: (1) that they will suffer irreparable harm if the injunction does not issue; (2) that defendant and others will not be irreparably harmed by the injunction; and (3) that the public interest favors entry of the injunction. *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958); *accord Wisconsin Gas Co. v. Federal*

*Energy Regulatory Comm'n,* 758 F.2d 669, 673–74 (D.C.Cir.1985). There is virtually no dispute that without injunctive relief plaintiffs will be irreparably harmed. The Douglas County Bank and Trust suspended their operating line of credit in January and called due the approximately $250,000 outstanding on that loan; the John Deere Financing Corporation repossessed four combines and related equipment from plaintiffs one month ago; the Federal Land Bank, holder of the first deed of trust on the farm itself, has instituted foreclosure proceedings which, unless forestalled by action of this court, will be completed no later than June 25. Without relief from this court, plaintiffs will lose their farm and be forced into bankruptcy in less than three weeks.

Defendant, on the other hand, will suffer no cognizable injury at all if this court grants plaintiffs the relief they seek. Plaintiffs have not asked for an injunction directing defendant to disburse funds to them, nor could they, given the Tucker Act limitations discussed above. An injunction enjoining defendant from suspending plaintiffs from participation in the 1987 price support and CRP programs could serve as a predicate for money damages against the government in the Claims Court. Payments under those programs, however, do not come due until October, and this court has scheduled a final hearing in this matter for mid-July, and has given its assurance that a final decision will issue before October. Under these circumstances, defendant will not be harmed by the relief sought.

Finally, the parties offer conflicting arguments as to where the public interest lies in this matter. Thus, for example, defendant suggests that the integrity of the farm subsidy programs may be endangered if those who file incorrect or false applications escape unpunished. Plaintiffs respond by pointing to the frustrated expectations of third parties, primarily lenders,

---

**6.** At the hearing, however, the defendant denied that it was characterizing plaintiffs' questioned actions as "fraudulent," or "a device to deceive," stating that had it so found then plaintiffs would be totally excluded from participation in the programs. Accordingly, defendant asserts, the "bad faith" or "conflicting information" rose only to the level of limiting plaintiffs to a one-person participation rather than nine.

who extend credit on the understanding that a given farm is entitled to certain payments over the 10–year life of a CRP contract and then find those benefits jeopardized years later because of ASCS' person re-determination.[7] The court finds that on the whole, the equities cited by both parties tend to balance out. Because plaintiffs have shown that the balance of harms weighs heavily in their favor, however, and because they have further demonstrated that they have a substantial likelihood of success on their claim that the agency acted arbitrarily and capriciously, the court will grant them the relief they request.

Accordingly, it is hereby

ORDERED that defendant, its agents, employees, officers, and representatives, and those acting in concert or participation with any of the foregoing, preliminarily are enjoined from suspending plaintiffs' participation in defendant's farm programs (production adjustment program and conservation reserve program) for 1987 and hereafter for the duration of the preliminary injunction as a nine-person farm operation; and it is

· FURTHER ORDERED, that this Preliminary Injunction shall remain in effect until the final hearing on the merits of plaintiffs' complaint (scheduled to commence on July 16, 1987, at 10:00 a.m., and to last for two days, which may, as appropriate, include brief testimony), and a decision rendered thereon, or until further order of this court; and it is

FURTHER ORDERED that plaintiffs' brief, if any, supplemental to that already on record, must be filed no later than June 11, 1987; opposition shall be filed by June 19, 1987; and reply, if any, by June 24, 1987. There shall be no extensions. It is

FURTHER ORDERED that plaintiffs shall post a bond in the amount of $1,000, cash or surety, on or before 1:00 p.m., June 9, 1987, failing which this injunction shall stand immediately dissolved.

IT IS SO ORDERED.

7. A banker associated with Douglas County Bank and Trust extolled not only the character and reputation of the plaintiffs, but reflected that the bank and community had relied on the

## ORDER

In accordance with the Memorandum Opinion to be issued forthwith, and in consideration of the Opinion and Order of June 5, 1987 granting plaintiffs' request for a preliminary injunction, the submissions and arguments of the parties for the July 16, 1987 hearing on the permanent injunction, the administrative record herein, and the imminence of foreclosure of plaintiffs' farm, it is accordingly hereby

ADJUDGED that defendant's suspension of plaintiffs' participation as a nine-person farm operation in defendant's farm· programs (production adjustment program and Conservation Reserve Program) for 1987 was arbitrary and capricious; ,and it is

ORDERED that defendant, his agents, employees, officers, and representatives, and those acting in concert or participation with any of the foregoing, are permanently enjoined from suspending plaintiffs' participation as a nine-person farm in defendant's farm programs for 1987; and it is

FURTHER ORDERED that this case be remanded to the defendant for his redeterminations as to the "person" eligibility of plaintiffs for participation in defendant's farm programs after 1987, in accordance with due process and consistent with the Memorandum Opinion to accompany this Order.

IT IS SO ORDERED.

## MEMORANDUM OPINION

On June 5, 1987, as a result of a two-day hearing, this Court preliminarily enjoined the defendant from suspending plaintiffs' participation in the defendant's farm programs (production adjustment program and Conservation Reserve Program) for 1987 and hereafter for the duration of the preliminary injunction, as a nine-person farm operation. Opinion and Order, June 5, 1987, hereafter Op. I, provided a 22–page explication of this action, which is fully

continuation of the contract in question which, when abruptly severed, occasioned severe jeopardy to third persons as well as plaintiffs.

incorporated herein as part of this opinion. Final hearing on the merits, consisting exclusively of argument, took place as scheduled July 16, 1987. No additional testimony or documentation was offered. The parties rested on the prior submissions, the administrative record, the record of the preliminary injunction hearing (and objections raised thereto), and the brief supplemental filings. During the course of argument on July 16, however, certain matters were focused and clarified.[1]

Plaintiffs have continued to disavow any interest in recovery in this Court of any sums past due for prior crop years. Framing the instant claim as "one seeking redress for arbitrary and capricious agency action and violations of their due process rights," Op. I, at 11, they seek now a declaration of permanent eligibility for receipt of price supports and Conservation Reserve Program (CRP) benefits as a nine- rather than a one-person farm, which declaration would have the prospective effect of entitling them to federal benefits and could serve as a predicate for money damages against the government in the Claims Court.

Since 1981, as detailed in Op. I, plaintiffs have participated in one or more of USDA's farm programs. For price support programs, 7 U.S.C. § 1308 sets a total limit of $50,000 which any one person may receive annually from USDA. They participated in the price support programs initially in 1981 as a nine-person farm, but upon reconsideration the county committee reduced plaintiffs to a four-person entity. The Eschs accepted this determination. In 1983 and 1984 plaintiffs were paid benefits pursuant to their four-person farm application for those years. Their federal income tax returns reflected for corresponding years the same four-person partnership. The four brothers who constituted the four-person

partnership received a warranty deed in mid–1984 from the seller of the property which conveyed the farm and its assets to them. In the Fall, 1984, all plaintiffs executed a partnership agreement among themselves in which the farm was sold to the new nine-person partnership with all its equipment, liabilities and other assets. The September, 1, 1984 deed reflecting this transaction was recorded substantially later, on January 9, 1987.

In 1985 and 1986 plaintiffs received price support program advanced deficiency payments pursuant to their applications as a nine-person partnership. Their federal income tax returns for those years reflected the nine-person partnership.

Prior to entering into the CRP contract, binding the Eschs and the government for ten years, the partnership of nine in 1986 had approached the Douglas County Bank & Trust Co. with the prospect of bidding on the CRP announced that year. After researching the matter, the bank (secured lender for the partnership) agreed to allow the partnership to bid.

The plaintiffs entered the CRP after their bid for participation was approved and a formal contract was executed by the plaintiffs on March 14, 1986, and the Commodity Credit Corporation on April 10, 1986. The execution of this contract occurred two years *after* plaintiffs entered into the formal nine-person partnership in late 1984.

As a result of this contract for the ten-year period October 1, 1986 to September 30, 1995, the government, in effect, "rented" 12,367.4 acres of plaintiffs' land, which plaintiffs agreed to take out of production. Representing the share of each owner as either .1112 (Patrick) or .1111 for all others, the contract was signed by Patrick J. Esch

---

1. In June the plaintiffs had assumed that the preliminary injunction would allay concerns of their creditors sufficient to cause cessation of collection efforts. Not so. The Federal Land Bank, not a federal entity despite its name, was unwilling to postpone a foreclosure proceeding set for July 8; cognizant of the instant proceedings in this Court, that state action has been stayed, however, until July 21, 1987, through the compassion of the Colorado judiciary at the importunings of plaintiffs' counsel and government counsel. Accordingly, this final opinion (Op. II) has had to be generated without benefit of transcript in a time frame compressed by urgency and substantially reduced from the earlier anticipated October parameter. See Op. I, at 14.

for himself and by him for each of his eight siblings "POA."

The 1987 CRP contract covers 498.5 acres, similarly "rented" for ten years, with similar share percentages and form of execution by the Eschs. The Eschs executed this contract on August 13, 1986; the government's representative signed it on October 8, 1986.

During May 1986 the Baca County ASCS office requested that a farm operating plan (ASCS-561-B) be completed by the Eschs. This "561" was a newly revised form; neither it, nor predecessor forms, had previously been required by this county committee nor used, of course, by the Eschs or any other local farmer-applicants. The appropriate 561 was finally received by the Eschs in mid-June, unaccompanied by instructions. Neither guidelines nor guidance were provided plaintiffs in their completion of the document. There was no suggestion of agency interpretation. The Eschs simply responded to the specific questions. Two are relevant to our inquiry: the first related to the percent share of all members of the partnership "having an interest in the entity." Each of the nine partners responded by attributing to himself/herself 11.1 percent interest, save for Patrick Esch who noted his interest at 11.2 percent. The more critical question on the 561 asked as to each of five categories: capital, land, equipment, labor, management, "What contribution is each member making to the entity?" No partner claimed contribution towards labor. Each partner, except Patrick Esch at 11.2 percent, reflected his/her contribution in each category as 11.1 percent. *See* (Administrative Record (AR) 294–296). Seven—nine months later the agency would characterize these responses as not only untimely (form received in mid-June was submitted in early August), but, more significantly, as "incorrect", "inaccurate," "a device designed to evade the payment limitation rules," "false," finding "bad faith," and strongly suggesting intentional misrepresentation and fraud. Subsequently, at the preliminary injunction hearing, the Eschs testified, persuasively and credibly, that, in their intent and belief, the shares of the nine siblings were equal and commensurate to the contributions made by that partner and the others. The ascribed percentages of interest and contribution correspond precisely to those reflected on the CRP contract. Executed by the Eschs, the 561 was submitted to the county committee on August 4, 1986. On August 18, the Baca County ASCS office approved their application, determining nine separate persons for payment limitation purposes.

The Office of Inspector General (OIG) had commenced its audit of the Baca County ASCS office and plaintiffs' entity, the L.J. Farms Partnership, eight days earlier, on August 10, 1986. The payments expected by the plaintiffs in October 1986 were suspended pending determination of the audit. Plaintiffs did not alone bear the impact of this decision. It caused not only substantial unrest among plaintiffs' creditors, but profound disbelief at the government agency's actions; some creditors avowed faith in the plaintiffs' credibility. In the business judgment of one substantial creditor the Eschs' farm operation was indeed a nine-person partnership, a fact relied upon when that bank gave its agreement to the plaintiffs' participation in the CRP contract. That contract became part of the bank's collateral just as the crop proceeds would have been had the land not been taken out of production and had the partnership not destroyed 6,300 acres of wheat pursuant to that contract which the bank had financed through operating loans. Estimating that it lost $550,000 given up in reliance on the CRP contract ($300,000 for the value of the wheat and $250,000 deficiency payments from these crops), the Douglas County Bank & Trust Co. wrote the State Colorado ASCS on November 4, 1986:

> ... L.J. Farms operated as a nine member partnership for all of 1985, so the USDA should have had plenty of time to make such a determination and we should have been reasonably assured that such a determination had already been made. We know that they are a legal nine man partnership because of

the partnership agreement that they gave us in 1984....

Bluntly stated, we relied on the signed CRP contract for our approval of the destruction of the crops and the forfeiture of the deficiency payments. L.J. Farms is now unable to plant a wheat crop for 1987, therefore, two years of income is lost because of our reliance on the contract. [AR 307-308.]

By letter of March 16, 1987 the plaintiffs were advised by the state committee that the Agricultural Stabilization and Conservation Service's Deputy Administrator for State and County Operations (DASCO) in Washington, D.C. had concurred with the OIG's determination that the partnership should be considered one person for payment limitation purposes "for the reasons contained in audit number 03099-99-KC." DASCO did not then elaborate on the reasons for this determination. Later, in June 1987, representatives from DASCO averred (at the preliminary injunction hearing) that the case was reviewed on appeal "as if it has never been looked at before" (Tr. 240, 241); yet, Thomas Von Garlem, the Assistant Deputy Administrator, had earlier testified on March 31, 1987, at the hearing on the application for temporary restraining order, that "we have some record that would indicate that they didn't tell the whole truth all the time." Tr. (TRO) at 43; id. at 47. "... There was definitely some suggestions of [fraud or collusion].... We have not looked at it yet, at that," id., 47. DASCO did not notify plaintiffs that it suspected fraud or collusion prior to Von Garlem's testimony at this hearing, even though at least one of the audit's recommendations (which DASCO is not obligated to consider) was related to fraud. Id. 47-48. The audit was strongly critical of the local committee for its failure to adequately follow the judgment limitation program regulations and provisions as they applied in 1984 to plaintiffs and for its failure to substantiate the validity of the operation or to determine the actual number of persons involved in the partnership in 1984. (AR 362.) The audit also noted that the U.S. Attorney's Office had declined to prosecute this matter in favor of administrative remedies (AR 372).

It was not until the appeals hearing in April, 1987 that plaintiffs were notified formally which of their actions had prompted the agency to suspend them from participation in any current price support/CRP program. They were then advised that:

... your clients presented an ASCS-561-B with incorrect information pertaining to the contributions of land, labor, capital, equipment, and management. The record also indicates that the ASCS-561-B information was first requested in May 1986, although it was not completed and submitted to the county office until August 4, 1986. Since your clients failed to provide timely or accurate information for a proper person determination, we have determined that no relief is justified for any payments otherwise earned in 1987.

April 15, 1987 decision of DASCO, at 4.

The May 6, 1987 reconsideration decision reiterated that there was no basis for granting relief for 1987, as DASCO had for 1985 and 1986. For those earlier years DASCO had determined not to hold plaintiffs responsible for the agency's error, through its county committee, in not getting the 561 filled out for 1985 and early 1986. The Baca County ASCS office had "failed to obtain the proper documents, including farm operating plans, from [the Eschs] prior to the time crops could have normally been planted in the area." May 6, 1987 decision of DASCO, at 1.

As for 1987, however, DASCO asserted that the Eschs were put on notice as early as May 1986 that their farming operations and eligibility for payment were to be the subject of the OIG audit to be completed. (It did not begin until August 10, 1986.) DASCO observed that the correct form was given to the Eschs in mid-June 1986 which, when completed:

contained inaccurate and misleading information, which clearly indicates the lack of good faith and could be construed as a device designed to evade the payment limitation rules.... We do not assume any responsibility for responses of-

fered to inquiries [by the Eschs in September 1986 to county and state offices as to actions to take in preparing for the 1987 crops with respect to their CRP obligations] where a producer has concealed information or offered misleading information that would have a bearing on the application of specific program provisions or rules.

*Id.* at 1. But, although this latest DASCO decision contended the Eschs should have been forewarned by May 1986, and therefore not acted to their detriment,[2] it is clear that the Eschs were only notified in mid-March 1987, at the earliest, of the agency's determination that the nine individual partners' contributions were not commensurate with their claimed equal shares of the proceeds. Tr. 137.

Nonetheless, despite the clear and unmistakable language of the April and May appeals' decisions, the defendant's representatives now testify that the agency is *not* accusing the Eschs of lying but still believes they "hadn't told the whole truth"; that it is *not* accusing the plaintiffs of "fraud" or a "device to deceive" but remains convinced that the plaintiffs failed to provide accurate and adequate documentation to the county committee. This failure, it is contended, misled "the agency in general," Tr. 255; "the document [561] that was presented did not reveal the facts as the records revealed the facts," Tr. 257. In responding to the Court's inquiry as to where the "entire fault" could be fixed, Assistant Deputy Administrator Von Garlem testified that the fault resulted from the plaintiffs' representations that their shares were commensurate with their equal contributions.

Title 1308(5)(A) of Title 7 directs the Secretary of Agriculture to issue regulations defining "person" for purposes of payment limitations; those regulations, appearing in 7 C.F.R. § 795.7, in essence state that members of a partnership may be considered "persons" for payment limitation purposes if they each contribute a commensurate share of land, labor, management, equipment, or capital to the partnership. For "person" determination it is sufficient that any one of the foregoing criteria is met.

DASCO determined that only a series of paper transactions had occurred with no substantive change to the farm operation when the nine-person partnership was formed in 1984, "since the same land is being farmed by the same people with the same equipment, ... through these series of events the contribution by individual members were not commensurate with the claimed shares of the proceeds," (April 15, 1987 decision at 2–3).

Without determining whether its reasoning could otherwise withstand scrutiny, the agency decision at least offers *some* facts relatively detailed, as to the components of land and capital; it presents *some* rationale as to why the agency declared plaintiffs' nine-person farm operation as one person for payment limitation purposes. But mention of the other categories—management and equipment—is sparse indeed, without demonstrated factual basis and without analysis for the agency's conclusion.

It is most important to understand what has happened here. The agency's final decision, prepared by Carolyn Burchett (the assigned program specialist and hearing officer for the administrative appeals hearing), for the approval of one of three persons: Assistant Deputy Administrators or the Deputy Administrator, stated that:

> A further agreement was made that the various partners would fulfill specific roles ranging from general management to transportation to insurance to farm technician. Our review indicates that these specific roles do not result in equal management responsibility for the partners.

April 15, 1987 decision of DASCO, at 3.

Nonetheless, on examination at the June 1987 hearing, the following ensued:

> Q. (Mr. Pires): Okay. What about the management? Are you contending that

---

**2.** The plaintiffs testified that they gave up the opportunity to plant wheat when advised by the state that their CRP contract was in effect until the state office said otherwise.

they don't all provide equal management?

A. (Mr. Von Garlem): I have not gotten that close to the record to make that assertion one way or the other.

Q. Thank you.

The Court: So you are not contending that, but you are not not contending that. You are just neutral at the moment.

The Witness: Yes, your Honor.

The Court: That was not one of the points that you used to disqualify them, is that right?

The Witness: Yes, your Honor.

Tr. 151.

But, if the absence of knowledge about management was not used to disqualify the Eschs, the data that *was* provided by the Eschs on the management category was also not used to assist their position. It should have been, according to the defendant's own direction that *all* of the contributions are to be quantified. We are therefore confronted with totally inconsistent positions: the written decision which unequivocally states that the partners do not have equal management responsibility and the decision-maker (who "signs off" interchangeably with two others in his office, Tr. 125) who testified that he was neutral on that category of management and "could not contend that they don't all provide equal management." There cannot be justification or rationale for such a "flipflop" crucial decision made in the absence of essential evidence.

The five categories of contribution are to be evaluated by the county committee initially, and later, if necessary, by DASCO.

What we direct the county committees to do is to quantify *all* of those contributions and then, if the contributions are commensurate with the claimed shares, then approve it ... *each member of a partnership does not have to be equal.*

Tr. 150 (emphasis added).

■ There is no regulatory requirement that the farmers actually live on the farm or go there daily or work the fields. There is no requirement that the shares be equal to contribution in each category; an affirmative evaluation can be based on only one

category satisfying the equal share/contribution analysis (Tr. 148).

Advising that she was "searching for the foundation" for the decision ultimately made, "so that I can make an appropriate ruling on this case when we come to the conclusion of the hearing" (Tr. 163–164), this Court asked Von Garlem:

What information provided brought you to the conclusion that these people [the Eschs] would be ineligible and what information not provided brought you to that conclusion, and then I will have a frame for that.

The response did not fully answer the inquiry. Mr. Von Garlem could not specifically respond to numerous other questions because

... I received a lot of help in doing that. We had folks ... on whom I depend very heavily who spent hours and hours....

Tr. 164.

... And like I say, I have already admitted I did not go through that record except in a cursory type view as we sat down to discuss what specifics they had found in the case. And it was on the basis of those discussions, depending on that staff, that we arrived at those kind of opinions and findings.

Tr. 164–165.

While facts *may* exist in the record supportive of the agency's determination, while the agency may eventually be able to square its interpretation with its disqualification decision, we cannot so assume when the decision on which the agency rests is silent as to that evidence, if any, and silent as to how its interpretations of the commensurability issue impact on that evidence.

■ These omissions and inconsistent positions are critical. In the absence of data as to each category, the agency could not quantify *all* of these contributions (in each category for each person) and then evaluate, as it was required to according to its own interpretations, whether those contributions are commensurate with the claimed shares. Yet here, the agency did

just that by actions we hold to be clearly arbitrary and capricious and absent substantial evidence.

By its final written decisions (April and May) it became clear that the agency had *unequivocally* determined that plaintiff had concealed some relevant documentation and provided other misleading information; this, to the agency, understandably indicated lack of good faith and "could be construed as a device designed to evade the payment limitation rules." As recently as the pleadings filed in May and June 1987, the defendant charged the Eschs with attempting to deceive the government, stating they had "misrepresented their status in 1984," and filed a "false and misleading Form 561." But, in June 1987, at the preliminary injunction hearing, the agency began to "back pedal" from those characterizations of the Eschs. Those characterizations, however, were, in substantial part, the predicate of the decisions to disqualify plaintiffs. When the Court asked if Mr. Von Garlem's definition of the "story" he attributed to plaintiffs was a "lie," or "falsehood," or "misrepresentation," this witness responded:

> Well, I understand that schemes and devices and lies—and that's possibly an agency problem in that we have tried to not get into scheme and device and just say that if you don't follow the rules, the best you can get is what you would have earned had you followed the rules. And like I say, that is—in retrospect, I don't know which is the best way to approach, but we approached it by saying, "Look, we don't agree with all the data that you gave us and we believe, based on the data we have, that the shares are not commensurate and that you're only eligible for one payment limitation", as compared to the other option of saying "it was a scheme and device, you're not eligible for any benefits", et cetera.

Despite the language of the formal decisions, the agency now maintains that its final determination *"did not indicate"* that the plaintiffs' 561 operating plan "rose to the level of being a device designated to evade the payment limitation rules." Tr. 263. Nonetheless, although it has altered

its position on the intent/bad faith of the Eschs, the agency steadfastly and arbitrarily refuses to reconsider those decisions. The record cannot support that conclusion.

It is important to discuss briefly the enormous reliance the government places on the decisions of its 3,000 local county committees, representatives of the agency at the root line among the nation's 2,000,-000 farmers. The very strength of such committee lies in its unique knowledge of its community, its residents, its neighbors.

> We depend very heavily on our county committees ... But we have a lot of range and variation in committees, from committees that ask for everything in the world to committees that don't ask for anything.

Tr. 166 (Von Garlem).

Yet, when the farmer places similar reliance on the local county committee, he does so at jeopardy. Consider what happened to the Eschs. As DASCO's Von Garlem testified:

> Farmers depend heavily on the county offices for advice, too heavily. It's a convenience; they don't have to hire a lawyer until things go bad, and then they hire lawyers. And now, suddenly we have regulations that are published, they're in the Federal Register, they're available to all. But it's inconvenient. And I plead guilty myself. I have a file that thick before me ... I depend on Carolyn to tell me what is in there.

Tr. 174–175.

In 1986, as in years before, and as they rightfully assumed they could do, the Eschs relied heavily on the agency's representatives in Baca County, their neighbors in this town of 600. They provided the committee all asked of them. The committee, satisfied and not misled, made its determination favorably to the plaintiffs. The Eschs were told months later that the county committee, severely criticized in the OIG report and at DASCO, did not adequately perform its administration of federal programs and, in the Eschs' case, its determination of them as a nine-person partnership for payment limitation pur-

poses. Mr. Von Garlem has testified that had the committee responded as expected by DASCO at an early time, before any commitment was made by the government or the Eschs, the committee would have required more data from the Eschs. DASCO strongly suggests that despite the committee's errors, the Eschs should have recognized that additional data was necessary and provided it, even though the committee was already satisfied.

> ... as a principle, the farmers file an operating plan and we approve them for a number of persons based on the operating plan with the assumptions that they are going to carry out the plan. And if we find they don't carry out the plan, then we will ask for payments back.

Tr. 177. The Eschs did file an operating plan approved by the county committee, but Von Garlem testified:

> We haven't gotten far enough into it to know whether they followed the plan. Our problem is that the plan was not supported with data to justify nine equal persons. *In all sincerity, we have never looked at exactly—there was some "new information that I was not aware of [that in fact they did file income tax returns as nine persons]."*
>
> *I don't know how [county committees] can make their determination ["properly, and an informed judgment"] without this 'basic' information.*

Tr. 178, emphasis added.

In this case it was the decision-maker at DASCO who did not know that the Eschs had filed their 1985 and 1986 income tax returns as a nine-person partnership (information indispensable to a "proper and informed judgment") (Tr. 178), although the 1985 income tax return was in the Administrative Record (Tr. 181).

Due to the complexity of the commensurability regulations, there are occasions when Von Garlem continues to "hold(s) to the decision that the contributions are not commensurate" but nonetheless has proposed a redistribution of the percent of shares on paper to be able to regard each farmer partner as a separate person for

payment limitation purposes, thereby increasing the person determination. (Tr. 158–160). *See also* PX 17, Von Garlem's decision of April 7, 1987. He is, however, unwilling to grant the plaintiffs similar consideration since he is

> not prepared to agree today that the plaintiff(s) gave our county committee all the data necessary to make the decisions that they made, and that's basically what our Inspector General found....

Tr. 132.

The agency has withdrawn its accusation of bad faith. This, therefore, can no longer be part of the consideration used to disqualify the Eschs from participation in the farm programs. Yet DASCO will not extend to the Eschs for 1987 the same consideration for relief as provided to farmers who relied on the decision by the county office in good faith.

Recently, in recognition that "some of our interpretations were determined to be too stringent," the agency advised all state and county offices in the nation of its payment limitation policy for 1987, "retrenching to try to be more reasonable for the '87 year," Tr. 113. That policy includes 1987 "person" determinations and states, in relevant part:

> If the 1987 operation plan:
> A. Does not reflect an increase in the number of "persons" from the number of "persons" in 1986, COC may use the same interpretations used to make 1986 "person" determinations....

PX 14, at 1. The agency will not, however, apply this policy to the Eschs for 1987, who were accepted as nine-persons for 1985 and 1986 by the county committee and had even been granted relief by DASCO from disqualification as such because the Eschs had relied on the judgment of the county committee.

A sampling only has been presented here of the arbitrary and capricious actions of this agency in its interaction with the Eschs on the long trail from county committee acceptance to Washington, D.C. rejection. That sampling, however, serves to illuminate, clearly, that the agency did not consider all relevant factors in making its final decision. More importantly, belea-

gured by the burgeoning case load, reviews, appeals, and "too few to do too much," well-respected, well-intentioned, but overworked administrators did not apply their judgments dispassionately and fairly. As a result, material considerations were ignored or overlooked; the aura of the original charges and countercharges lingered, infecting the process and decisions. There is no way of knowing what the results would have been had the proceedings advanced, as they should have, in an environment full of fact and free of bias.

■ As recited in some detail in Op. I, particularly at 16–19, and therefore unnecessary to repeat, basic due process has been denied the Eschs. As stated before, this Court cannot declare such agency action rational, particularly when the agency fails to indicate what standards guided the action.

The Court is not unmindful of the responsibility of the government to zealously guard the public treasury for the benefit of all its citizens and the special duty of its Department of Agriculture to zealously measure, fairly and evenly, the rights of all its farmers, nearly 90 percent of whom depend for survival today on farm support programs.

Here, however, the United States Department of Agriculture has acted arbitrarily, capriciously, without substantial evidence and in the absence of due process in reaching its decision to deny the Eschs relief for 1987 as a nine-person farm operation for payment limitation purposes in defendant's farm programs (production adjustment program and Conservation Reserve Program). That decision must be reversed.

This case shall be remanded to the defendant, Secretary of the United States Department of Agriculture, for his redeterminations as to the "person" eligibility of plaintiffs for participation in defendant's farm programs after 1987, in accordance with due process and consistent with this Memorandum Opinion.